May it please the Court, Stanley D. Saltzman of Marlin & Saltzman, on behalf of the appellants. And we are here on really a follow-on, it looks like, to the Diltz v. Penske matter, rendered a couple, two years ago, and the earlier decision of this Court in Mendonca. So we have, I have the feeling that plaintiffs, the appellants in this case, were caught in a time conundrum, which is that we were, basically, we had judgment entered against us in the District Court just before the Diltz decision was rendered by the United Circuit by this Court. So we did ask, if the record may show, for a remand to the District Court so that the Court might reconsider its rulings in light of Diltz. That was declined, and therefore we're still here. Who declined that, may I ask? Was there a motion panel? A motion panel, yes. Okay. We thought it would be best to have this matter reordered, so to speak, so that the Court could come up one way or the other with the benefit of Diltz having been considered. Because the District Court did rely on the District Court analysis in the opinion that was reversed, right? We have two rulings before you, Your Honor, that resulted in the judgment. The first was the ruling on a judgment of pleadings that the meal and break claims were preempted by Diltz in the Diltz District Court decision. And that decision was rendered. And then six or eight months later, the defendant filed a motion for a summary judgment to have the wage claims also preempted under F-Quad A preemption. And then once that was granted as well, then we filed our motion or the appeal. There was a judgment entered. We filed the appeal, and now here we are. We thought it best that Diltz District Court be set aside, that the matter be reconsidered under Diltz Ninth Circuit. So that wasn't granted, so we're here. Okay. So it would be your position then that Diltz changes the analysis and that you prevail under Diltz. Is there a reason that we should wait to see the outcome of Costello v. Bevex, which currently has a cert petition pending before we decide this case? I don't believe so, Your Honors, and I'm obviously familiar with the Seventh Circuit decision, as is this Court. Brilliant opinion at the District Court level, right? Undoubtedly, and we share in all of that. But we have two issues pending here, really. I think it's time that this matter be disposed of. We have the wage claims, which are governed by MnDONCA. We have the meal and break claims, which are governed by Diltz Ninth Circuit decision. The interesting part of that is that although MnDONCA is about 20 years old. Let's say I agree with you. I'm not saying that, but let's assume that I agree with you that Diltz and MnDONCA go your way. But still, is there going to be anything that the Supreme Court, if they were to take the case in Costello, that would give us guidance in doing this analysis? Because last time I checked, they're bigger than I. Okay? And you're bigger than I. I guess if the Supreme Court were to take up Costello. I know the facts are slightly different. Yes. It's an independent contractor law. It really deals with the relationship between the workers and the company, how they're structured, as opposed to simply the issue of meals and breaks. I could see the Supreme Court ruling in the Costello case, and not even getting to our issues, because we have the issue of, in our case, only how the employer deals with its employee, their admitted employees. In Costello, we have the issue of they're treating them as independent contractors, and the question there is whether that statute precludes them or is preempted so that they cannot deal with them as employees, as opposed to independent contractors. Here we're admitted employees. Wasn't there a cert petition on DILTs? There was, Your Honor. And it was denied, right? Yes. So if I were you, I might argue that that would be why we should go ahead with the application of DILTs. And as I said, the Supreme Court has taken this issue. They looked at it. They decided not to take it up. They didn't say it was horrible. Or they could have. We don't know what they're thinking. They could have. We know that they declined to take a look at this brilliant decision of this Court. And we think we're governed by that brilliant decision of this Court, which, frankly, we've agreed with for 10 years now. We're kind of tired of this case. It's been certified for literally eight years with notice not having gone out. It's been stayed because of Brinker, and then it's been slowed down because of DILTs. It's time to move the certified class forward. Let me ask you something. The first circuit case that was 2014, was cert denied on that, too? Oh, I cannot tell you. It might be a thing where they're doing state ‑‑ I mean, they're doing let the states make their laws. The first circuit case was not ‑‑ Oh, it wasn't even sought. Okay. Thank you, Mr. Lee. Thank you. This is kind of like that thing where you call a friend, you know. A lifeline. 50‑50, a lifeline. They've gotten to know each other pretty well in these last eight years. A lifeline. Definitely on a first name basis after nine years. All right. No one in the audience make suggestions. Okay. We really don't want to hear from the audience. Okay. So I actually, obviously, plaintiffs feel, the appellants feel that DILTs controls, Mdontka controls. We don't know what room there is to wiggle. The appellee has argued in its brief and will probably argue that Penske was limited to its facts, the Ninth Circuit DILTs decision. Clearly, we believe it was not. The footnote two in the introduction, two footnote two in the decision, clearly says in the Ninth Circuit that we are not addressing this as to Penske's particular facts. We're addressing this as to the motor industry as a whole. So I don't think there's any room left for that to go. If I had anything I could offer this court where I think it could go and I think it would merit some discussion and maybe make DILTs a stronger decision to the full clarity, it's to give real credence to the words in the actual FQIA preemption language, the real, what the words mean when we talk about with regard to, with respect to the transportation of property. That obviously came up in the Dan City case and relates back probably 15 years earlier to Justice Scalia's dissent in Ars Garage, which was a dissent in that case but became really the majority view in the Dan City case. Justice Scalia was greatly prescient in that decision when he wrote at page 449, 536 U.S. 449, that states remain free to enact and enforce general traffic laws, general restrictions on the weight of cars and trucks, and other regulations that do not target motor carriers with respect to the transportation of property. Those words got lost for a few years along the way and came back really fully embraced by Dan City. And if we're going to give any credence to what those words mean, because they do not appear obviously in the ADA, we all know that, they do appear only in FQIA. If we're going to give credence to those words, our belief is, and this Court can go forward and actually make this clear, that the law to be preempted must be with respect to the transportation of property. And that doesn't mean it has an effect on transportation. It means it's directed at transportation. And that's why I wonder whether the case that's pending before the Supreme Court, they invited the Solicitor General to chime in on that, right? So maybe that bigger picture language that you're looking for will be presented by their presentation? I mean, would that be one analysis for waiting? Again, we can wait. I think I know what the decision for this Court ought to be. I think this Court ought to make this decision and move us forward. And then if, in fact, it becomes clear that there's guidance to be rendered by the Supreme Court, then we'll be affected by that. I have no problem with that. But I don't see any reason to wait. Is this a motion to dismiss? This is an early-stage dismissal. No, this case? Yeah. Actually, it's seven years into the case, but there was a motion for judgment on the pleadings. Right. After we were certified, after decertification was denied, then the preemption issue came up after the district court decision. So that started creating all these preemption motions that had not been raised. They'd been preserved by their pleadings, but they had not been raised. So there's no harm in sending you back, and then if the Supreme Court speaks contrary to Deltz, that will obviously be raised in the district court proceedings. Yes, it would have to come around again. Yeah. I don't doubt that. But like I said, since one case is dealing with the relationship of how one is classified as an employer or independent contractor, and we don't have anything near that issue, it is certainly possible. I understand, and that's an issue that's in a number of industries right now. So as I said, I think it's important that we give analysis to it and have the Ninth Circuit embrace the concept of the laws that are going to be preempted being limited to those that are actually directed at and with respect to the transportation of property. That will give further clarity. As the Ninth Circuit stated in Deltz, it listed in footnote one on the second page of the opinion, I think there were nine cases that had been decided in the defendant's favor and four or five cases that had gone in the plaintiff's favor against preemption. Our case was one of those. We're listed in the list of cases. So we've all been before this court now for a very long time, and I think we'd love to have the clarity that we're ready to go forward. If the Supreme Court, you know, if it really reaches this issue, we'll all know it at that time, but we don't know that now. And I just would invite the court not to let this be kicked down the road a little further for yet another year or two or whatever, or even three. We've been pending since 2007 this was filed. Okay. I'll let you reserve the rest of your time. Yes, thank you. Thank you. If it pleases the court, I'm Kevin Lilly on behalf of my client respondent, J.B. Hunt Transport, Inc. I want to start by reminding myself that there are two separate motions that issue before this court of appeal, and they involve very different issues, one of which is close to Dilt's. The other is, I would argue, new. New? New. Okay. And the reason is because the appellants did not and cannot seriously dispute the finding that's central in this case, that alternative-based pay, which is the second issue before the court, increases efficiency in the trucking industry by 7%. It adds an average of one drop per driver per week. It changed routes. It reduced the hours that drivers had to work to earn their wages. It reduced the costs of each delivery that's made by $4 a delivery, something that is directly linked to prices because our client links its prices to driver pay. It's called pay-as-you-go, pay-as-you-bill, bill-as-you-pay. And it raised drivers' wages by 10%. Alternative-based pay doesn't just raise costs. It allows you to increase costs. I'm sorry? Your argument is that it decreases costs. Yes, Your Honor. It decreases costs, and it increases driver pay by 10%. And we – and for that reason, this central finding, this central undisputed fact, makes this the issue. What I don't understand is how that excuses compliance with California's laws of general applicability. Well, there is no blanket exception for California laws of general applicability. In fact, the Supreme Court has reversed all sorts of laws of general applicability. One thing that DILTS actually would have, I think, benefited from, that the panel in DILTS would have benefited from, had they had more time to consider the Supreme Court's decision in Ginsburg v. Northrest, which, although it cites in passing, it actually – it held, the United States Supreme Court held, that a generally applicable contract bad faith law – that's a law of general application – was preempted. In American Airlines v. Wallens, there was a consumer fraud law. That was a law of general application. It was held preempted. In Morales, the first case, it was a consumer protection law, and as it was applied to advertising in the airline industry, and it was held protected. So the ninth – I do not think it would be fair to read DILTS so broadly that any law that is of general application is exempt from preemption. And might I make one additional point on that? And that is, the California meal and rest break laws, now we're moving back to the first issue. But that isn't really what DILTS held. DILTS held specifically that these meal and rest break laws did not relate to the trucking or whatever. Crisis rates or services. Right. Did not relate to. And it expressly talked about costs and how its effects on costs and addressed the argument you're raising right now. And its holding was – its actual holding, which is on page 649 of the DILTS opinion – is that defendants submitted no evidence to show that the break laws, in fact, would decrease the availability of routes to serve Whirlpool accounts or would meaningfully decrease the availability of routes to motor service carriers. In other words, the Court was ruling on a summary judgment motion. And as Justice Zuhari pointed out in his concurrence, that all that the trucking company in DILTS attempted to do was argue some hypotheticals. Well, okay. But you do a couple of things. You point to Judge Zuhari's concurrence in DILTS, which takes the view that the case rests on the lack of evidence put forward by the defendant in that case. But doesn't the fact that it's a concurrence indicate that a majority of the panel did not understand the holding to be so limited? I don't attempt to misrepresent the fact that Justice Zuhari's opinion was a concurrence. I do suggest that – It's like I wish my dissents sometimes were of the majority, but they're not. But – but – Wishing only gets you so far. But I – but in this case, I would – I would advocate, Your Honor, the Court was seeming to discuss at least a practical approach in this case. And with respect to DILTS, one practical approach would be to take the same approach that was taken by the Eleventh Circuit in Taylor v. Alabama. The problem with resting on Zuhari is that clearly – and clearly Judge Graber and Judge Kaczynski, who would comprise the majority opinion in this case, had to have disagreed with them. Otherwise, Judge Zuhari wouldn't have had to write anything separately. They would have integrated. And I'm sure just the fact that that's there, knowing how we operate, I'm sure there was a lot of back and forth and memos and discussion and thought given to producing a divided opinion. I absolutely don't suggest otherwise. But – but what I am suggesting is it was decided on a motion for summary judgment on limited evidence. And that – that, for example, the Eleventh Circuit in Taylor v. Alabama sent a case back on preemption and said it should be decided on a full record. And all I am saying – and I don't want to oversell the point, as both Justice Callahan and Judge Worthout suggest. I don't want to oversell the point. However, I think a fuller record would enable the court to make a better decision on preemption. I think otherwise what you end up doing is sitting in a court of law trying to decide whether or not a driver's getting off the freeway for a rest break sufficiently interrupts the route. I don't think that's the place in a deregulated trucking industry to do. But since the judge had – had thought – well, she was relying on the district court opinion in DILTS, which was then reversed. What about just giving the district court judge now the understanding here's DILTS, here's the law, hasn't been assert on it, so go back and get to work since you've been waiting so long to see how this plays out. What's your – is there an objection to that? I think there's no objection to that with respect to – I think there are two reasons to reach a different conclusion on the meal and rest break. Okay. But I'll set that aside for the moment. Go ahead. With respect to the meal and rest break piece, I think that is the approach taken by the Eleventh Circuit. They say decide it on a full record, go back. Right. In the meantime, this issue may reach the United States Supreme Court. But on the issue of alternative-based pay, there is a much fuller showing on a motion for summary judgment. And that showing goes to the Congress' intent in deregulating the trucking industry. The intent was an economic one. To increase efficient – the quote from Roe versus New Hampshire is maximum reliance on market forces, efficiency, innovation, and low prices. And I think on the facts which are undisputed in the summary judgment motion, we've proven to the court that it improves efficiency 7%. I don't think anyone with any notion of business or regulation could argue that a 7% increase in efficiency won't affect prices, routes, or services. And it doesn't just raise costs. That's the Mendonca argument. It doesn't – if it were just – if all alternative-based pay did was raise the cost to the carriers, then it would be an entirely different argument. But here, when we have proven that alternative-based pay is operating exactly as Congress intended deregulation to work, and that state regulation, this Armenta rule, this non-averaging rule, which is unique to California, is impeding that and causing trucking industry to operate less efficiently in a way that is inconsistent with the approach taken by the First Circuit. Note that my opponent did not address the First Circuit's approach in any of his briefs. It is – to rule that other than this way in this case. Ginsburg. If the kids were in the ninth, then we have to. I mean, it kind of ties our hands in some of this. Verrilli, Jr. And, Your Honor, if I were him, I would not be mentioning the First Circuit either. Ginsburg.  Verrilli, Jr. But I think that's your problem. I mean, the judges of this Court must consider how to harmonize the position taken in this jurisdiction with the decision in the first. You don't have to. Then, ultimately, yes, the Supreme Court will make the decision. But I don't think you have to go that far. I think this Court can look at alternative-based pay, make the judgment that my client made a case that is undisputed, that it is serving the interest of efficiency for which deregulation was created. Conversely, that a rule that prevents it from doing so is an impediment to that. Let me ask you a question. You're obviously knowledgeable about your client's business. And do other states have laws on meal and rest breaks and minimum wages that are different from California's? Yes, they do. There's a patchwork of regulations all over the country on meal and rest break litigation. Washington has them. I recall Colorado has them. California has them. So are you litigating this in every circuit right now? My client, in the First Circuit, prevailed in an argument which presents a very odd thing. A truck leaving Boston and driving to Los Angeles could not, if it could, operate as an independent contractor because the Massachusetts law in the First Circuit was held preempted. And then it comes and it would drive to California and it might face a different test. Here, meal and rest break litigation, a truck starting in Los Angeles and going to the First Circuit, would operate under different legal environments. And that's the entire principle behind avoidance of patchwork regulation. That's why it's important for this court to try and bridge the gap. And on this issue, on the issue that touches so closely to Congress's intent to deregulate the trucking industry, where we've made – I'm sorry, Your Honor, were you – No, no, I'm just thinking about this. Probably you're going to have to make this argument to the Supreme Court because its intent as opposed to language and its policy as opposed to what – how we've previously interpreted this particular language and how other courts have. And we can't skip the words of a statute and go to an ascribed intent. I think Justice Scalia would agree with me on that. Well, perhaps with respect to the meal and rest break laws, but with respect to the issue of alternative base pay and whether income averaging under the armamenta rule – So you're distinguishing wages from meal and rest break? It's really not wages because that to me suggests that all California is asking J.B. Hunt to do is raise its wages. But that's not what the regulation does. The regulation says you must pay every segment of time and you cannot use averaging, which prevents, in effect, you from operating more efficiently because drivers are driving all over. You can't tell a driver you're spending too much time filling out a form or you're sitting in the coffee shop too much. The best way to manage a driver workforce – and this was proven in our case. I would urge the Court to go back over the briefs. I know you've already done it. I've read your brief. Of course you have. But it was proven in that case that the company did studies. It used to operate based on hourly pay. And it was a huge savings that made drivers happy. It made the companies happy. It made consumers happy who pay 7 percent less for products. I'm not sure the drivers are so happy. I mean, aren't they the ones that are suing? We have one driver and his lawyer, and there's no evidence that there is a groundswell of support for hourly pay. Isn't this a class action, though? It was certified as a class action. But it is undisputed that alternative-based pay results in higher wages by about 10 percent. So one can assume many drivers will like that. Let me just ask one last question about – in Costello, it highlights that split, though, between your case in the First Circuit, right? Yes. And the Seventh Circuit. So that was one of the bases for bringing it up. So even though it has factual differences, it's got the independent contractor angle and it has differences, that is the basis, is the case you were just talking to us about that causes you to have this heartburn about crossing borders. Or your client's heartburn. Or your client, to have heartburn, right? But that's the other flip of the – And I think the best discussion of that you'll see in the First Circuit's opinion in Schwann. Oh, right. The Schwann case, which is discussed in the brief, because in the Schwann case, ironically, the plaintiff's lawyers, the parties who were supporting the regulation, pointed to alternative-based pay as a lawful alternative to using independent contractors. So here we have this perverse dialogue going on where regulations in the First Circuit are being attacked, where the recommendation by the plaintiff's lawyer is to use an approach that's outlawed in the Ninth Circuit, or that might be outlawed in the Ninth Circuit. And I think that's – one could not demonstrate patchwork regulation better than that. And with that, I'll rest.  All right. Thank you very much, counsel. You had some time left. Thank you very much. I'd like to begin by resolving the heartburn. I'll play doctor for a few moments. The heartburn appears to be J.B. Hunt's concern that they can't use activity-based pay in California if we prevail in this case. We've never claimed that. It's not our allegation. It's not in our complaint. We made it clear in our opposition to this motion for summary judgment. We've stated it again in this record. Plaintiffs do not attack activity-based pay. What we attack is activity-based pay that does not pay for all time worked. The defendant, in running its business, could – if it loves activity-based pay that much and it helps everybody out that greatly, let it do that, but let it then pay for all the primary tasks. The workers are not being paid. The drivers are not being paid, for example, for pre- and post-trip inspections. There's not much doubt that at trial, that time will add up to somewhere between 30 and 40 minutes of a day. Maybe 30 minutes max. I'm not sure exactly yet. There's no pay for that. They can certainly allocate activity-based pay, a piece rate. It's all – ABP is just another term for piece rate. They can put in a piece rate for that piece. They can put in a piece rate for the meal breaks – excuse me, for the rest breaks. All they've got to do is put it in their computer system. These folks are driving with the most current and modern computer systems, onboard computers. They're GPS monitored. The company knows where they are at any given moment of the day. They know how fast they're driving. They know where they're driving. They know if they're en route. They know everything about them. They might as well be sitting in the office. So they can put in a piece rate that says, Code 1, beginning rest break. Code 2, completed rest break. Pay them that hourly or pay them a piece. That should be hourly because we know exactly how much time that is. But the inspections, that can vary a bit. Give them a piece rate. Let them get it done efficiently. If that helps them in efficiency, we're all for that. This is a complete and total red herring. We tried to make that clear to the district court. We failed to do that. I want to make it clear to this court. We are not now claiming, and we have never claimed, that they have to pay hourly rate. They can pay wages under California law, include hourly, commission, or piece rate. Any one of the three they can do. And we have no qualms. We've said that it's in the record of pages 1292, 1299 to 1301. Those are pieces from our various briefs in this case. And it's there for you. We never claim that, and it's a complete red herring. The next issue I want to address is council talked again about a truck leaving California and ending up in New Hampshire. Well, that may be true for some of their drivers. Those drivers are not in this case. Our definition of our class excluded unambiguously what are called the over-the-road drivers. So they're not part of our certified case. They're not part of what's before this court. Our class is composed of what are called intermodal and the regional drivers that drive within California and may leave for one night and then come back in as a matter of course. Over 75% of our drivers don't leave the state of California. They're one red herring after another before you join that argument. The cases council cited regarding Morales, Ginsburg, and the other cases, those are ADA cases. They do not have the limiting language that I talked to you about earlier from the F-Quad-A, which is the law must relate, be with respect to the transportation of property. Now we know how to pronounce it. I'm sorry? F-Quad-A. I had no idea how to pronounce that. I'm glad I could help us a little bit here today. And then finally, with regard to these incentives which we embrace, we have no problem with these incentives. I will note that in Diltz, so I can find the page reference here, the court in Diltz said, nor does a state law meet the related to test for F-Quad-A preemption just because it shifts incentives and makes it more costly for motor carriers. In this case, if we're shifting incentives, and that would be at page 647, if we're shifting incentives, it's to their benefit. We have no problem with that. This case is ready for a decision. I think we should embrace this and we should add to it the clear language, limiting language, that makes the F-Quad-A so different than the ADA, and is another reason why the case is cited under ADA, while useful to look at, cannot change an F-Quad-A conclusion because we have to have a law that relates to the transportation of property. And with that, I'll submit. All right. Yes, unless you have any questions. No, I just want to thank both of you for a very helpful argument. You both were, and I love the fact that you both ended within 10 seconds plus or minus of your time. That really, that moot courts should come and watch both of you. If I could take credit for that, I would. That you were both, you were both, you represented your clients very well, and it's a pleasure to have argument when both counsel are so well prepared. Thank you. Thank you, Your Honor. Yeah, right. Right. Ditto. And the case of Ortega v. J.B. Hunt will be submitted.
judges: Wardlaw, Callahan, Kendall